IN THE UNITED STATES DISTRICT COURT
WETERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

MELITA DAWN BUSH                                                        PLAINTIFF

V.                                              NO. 15-5202

CAROLYN W. COLVIN,
Acting Commissioner of the Social Security Administration              DEFENDANT


**MEMORANDUM OPINION**

Plaintiff, Melita Dawn Bush, brings this action pursuant to 42 U.S.C. §405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying her claim for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. §405(g).

**I.       Procedural Background:**

Plaintiff protectively filed her current application for DIB on June 28, 2012, alleging an inability to work since October 7, 2011, due to tardive dyskinesia[1] and seizures. (Doc. 14, pgs. 170-172, 196, 200). Plaintiff's date last insured is September 30, 2016. (Doc. 14, p. 196). An administrative hearing was held on July 18, 2013, at which Plaintiff appeared with counsel and she, her husband, and mother testified. (Doc. 14, pgs. 32-65).

By written decision dated March 20, 2014, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe –

---

[1] Tardive dyskinesia – involuntary movements of the facial muscles and tongue, often persistent, that develop as a late complication of some neuroleptic therapy, more likely with typical antipsychotic agents. Stedman's Medical Dictionary 598 (28th ed. 2006).

seizures, tardive dyskinesia, and disorder of the cervical spine. (Doc. 14, p .17). However, after reviewing all of the evidence presented, the ALJ determined that Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Doc. 14, p. 17). The ALJ found Plaintiff retained the residual functional capacity (RFC) to:

> perform light work as defined in 20 CFR 404.1567(b) except she is limited to occasional balancing and climbing of ramps and stairs. Additionally, she is unable to climb ladders or ropes; must avoid hazards including unprotected heights and moving machinery; and is unable to operate a motor vehicle.

(Doc. 14, p. 18). With the help of the vocational expert (VE), the ALJ determined that Plaintiff was capable of performing her past relevant work as an office worker/credit card control clerk. (Doc. 14, p. 25).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which considered additional information, and denied that request on June 26, 2015. (Doc. 14, pgs. 5-10). Subsequently, Plaintiff filed this action. (Doc. 1). This case is before the undersigned pursuant to the consent of the parties. (Doc. 6). Both parties have filed appeal briefs, and the case is now ready for decision. (Docs. 12, 13).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II.    Applicable Law:

This Court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. Ramirez v. Barnhart, 292 F. 3d 576, 583 (8th Cir. 2002). Substantial evidence is less than a preponderance but it is enough that a reasonable mind would find it adequate to support the Commissioner's decision. The ALJ's decision must be affirmed if the record contains substantial evidence to support it. Edwards

v. Barnhart, 314 F. 3d 964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently.  Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed.  Young v. Apfel, 221 F. 3d 1065, 1068 (8th Cir. 2000).

It is well established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F. 3d 1211, 1217 (8th Cir. 2001); see also 42 U.S.C. §423(d)(1)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§423(d)(3).  A Plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant had engaged in substantial gainful activity since filing her claim; (2) whether the claimant had a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) met or equaled an impairment in the listings; (4) whether the impairment(s) prevented the claimant from doing past relevant work; and (5) whether the claimant was able

to perform other work in the national economy given her age, education, and experience.  See 20 C.F.R. §§404.1520, 416.920.   Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of her RFC.  See McCoy v. Schneider, 683 F.2d 1138, 1141-42 (8th Cir. 1982);   20 C.F.R. §§404.1520, 416.920, abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

### III.    Discussion:

Plaintiff raises the following issues in this matter: 1) Whether the ALJ erred in failing to consider all of Plaintiff's impairments in combination; 2) Whether the ALJ erred in disregarding the opinions and findings of Plaintiff's treating physician; 3) Whether the ALJ erred in his RFC determination; 4) Whether the ALJ erred in his analysis and credibility findings; 5) Whether the ALJ erred by failing to fully and fairly develop the medical record; and 6) Whether the newly submitted evidence to the Appeals Council might have changed the outcome of the case. (Doc. 12).

The Court finds this matter should be remanded in order for the ALJ to obtain a more recent Physical RFC Assessment by an examining physician, for the following reasons.

Plaintiff suffers from tardive dyskinesia, which apparently was caused by long term use of the medication, Reglan. (Doc. 14, p. 462). Plaintiff was first diagnosed with tardive dyskinesia by Dr. Angel Perez, of Northwest Arkansas Neuroscience Institute. (Doc. 14, p.. 407). Plaintiff also previously suffered from two seizures – one in 2008 and one in 2011 – and Dr. Perez managed Plaintiff's seizures with medication. On June 15, 2012, Dr. Perez referred Plaintiff to Dr. Alan Diamond, of Washington Regional Clinic for Senior Health, for management of Plaintiff's tardive dyskinesia. (Doc. 14, p. 403). Plaintiff began seeing Dr.

Diamond on June 27, 2012. (Doc. 14, p. 296). By July 17, 2012, Plaintiff's seizures were reportedly under good control by Dr. Perez, but Plaintiff's frequent involuntary and abrupt movements of her head continued. Over a period of time, Dr. Diamond treated Plaintiff's involuntary movements with medication, adjusting it according to the symptoms. On July 23, 2012, Dr. Diamond noted that Plaintiff had respiratory gasps, mild blepharospasm,[2] facial grimacing and severe, almost constant phasic cervical dystonia[3] with rotation to the left and no anterocollis,[4] and had intraoral tongue movements. (Doc. 14, p. 462).

On August 14, 2012, non-examining consultant, Dr. Sharon Keith, completed a physical RFC Assessment, and found Plaintiff was capable of performing light work, with occasional climbing ramps/stairs, and balancing, and never climbing ladders/ropes, or scaffolds. (Doc. 14,. 76). Two days thereafter, on August 16, 2012, Dr. Diamond reported that Plaintiff's tardive dyskinesia had improved, but she had poor balance and her movements were still the same. (Doc. 14, p. 424). She was not as symptomatic, because she had no respiratory gasps, no blepharospasm or facial grimacing, but had almost constant phasic cervical dystonia with rotation to the left and no anterocollis. (Doc. 14, p. 425). She also had intraoral tongue movements. (Doc. 14, 425). Dr. Diamond again adjusted Plaintiff's medication and reported if that did not work, he would inject botox for the cervical dystonia. (Doc. 14, p. 425). By September 18, 2012, Dr. Diamond reported that the severity level of Plaintiff's tardive kyskinesia was moderate, the problem occurred constantly, and the location of the abnormal movements included the left hand and neck. (Doc. 14, p. 427). Her

---

[2] Blepharospam – Involuntary spasmodic contraction of the orbicularis oculi muscle; may occur in isolation or be associated with other dystonic contractions of facial, jaw, or neck muscles; usually initiated or aggravated by emotion, fatigue, or drugs. Id. at 229.
[3] Dystonia – A syndrome of abnormal muscle contraction that produced repetitive involuntary twisting movements and abnormal posturing of the neck, trunk, face, and extremities. Id. at 602.
[4] Anterocollis – Anterior flexion of the neck, as seen in cervical dystonia. Id. at 100.

eye and face movements were reported as better, but she still had neck movements. (Doc. 14, p. 427). Dr. Diamond believed Plaintiff was compliant with medication, and saw no need to alter therapy because Plaintiff was responding. (Doc. 14, p. 428). Dr. Diamond proceeded with a botox injection on October 2, 2012, because Plaintiff had continued pulling to the left and down and had neck pain, and the symptoms were intermittent with exacerbations. (Doc. 14, p. 430).

On November 2, 2012, Dr. Diamond reported that the botox injection did not help, and that Plaintiff's head turned to the left with spasm, and that Plaintiff reported having problems with her activities of daily living. (Doc. 14, p. 511). Dr. Diamond assessed Plaintiff with spasmodic torticollis[5] – "she has tardive dystonia from reglan with improvement from tetrabenazine with the respiratory dystonia but continued craniocervical dystonia. …" (Doc. 14, p. 513).

On December 12, 2012, Dr. Bill F. Payne completed a Physical RFC Assessment, which mimicked the assessment of Dr. Keith. (Doc. 14, p. 93). On February 5, 2013, Dr. Diamond reported that Plaintiff had no benefit or side effect with botox, and restarted Plaintiff on tetrabenazine, because she was having more movements. (Doc. 14, p. 501). Dr. Diamond referred Plaintiff to Kansas University Medical Clinic for evaluation. (Doc. 14, p. 503). On April 29, 2013, Dr. Diamond concluded Plaintiff's spasmodic torticollis was of mild level and occurred intermittently. (Doc. 14, p. 495). On June 13, 2013, Dr. Diamond reported that Plaintiff had been taking Klonopin, which was helping her sleep better. (Doc. 14, p. 492). He also discussed weaning her off of tetrabenazine. (Doc. 14, p. 493).

---

[5] Spasmodic torticollis – A disorder of an unknown cause, manifested as a restricted dystonia, localized to some of the neck muscles, especially the sternomastoid and trapezia; occurs in adults and tends to progress slowly; the head movements increase with standing and walking and decrease with contractual stimuli, e.g. touching the chin or neck. Id. at 2002.

On August 6, 2013, Dr. Ahmad Al-Khatib, of Benton Neurocare, Inc., conducted a neurological evaluation and examination at the request of the Social Security Administration. (Doc. 14, p. 526). In the report, Dr. Al-Khatib reported that Plaintiff had not had any seizure-like activities since October 7, 2011, "until last Saturday, when she had another seizure-like episode. She denies noncompliance with her Keppra." (Doc. 14, p. 526). Examination of the spine revealed mild limitation of range of motion in the cervical spine. (Doc. 14, p. 527). Dr. Al-Khatib concluded that Plaintiff should be on seizure precautions, including avoiding driving, operating heavy or dangerous machinery, heights or swimming for one year of seizure free, and that she had no definite limitations in sitting, standing, walking, carrying, hearing and speaking. (Doc. 14, p. 527). Dr. Al-Khatib also completed a Medical Source Statement, wherein he concluded that Plaintiff could frequently lift up to 20 pounds and occasionally up to 100 pounds; could frequently carry up to 20 pounds and occasionally up to 100 pounds; could sit, stand, and walk at one time for four hours; could sit, stand, and walk a total of eight hours in an eight hour workday; could use her hands and feet continuously; could frequently climb stairs and ramps, climb ladders or scaffolds, balance, stoop, kneel, crouch and crawl; could occasionally be exposed to humidity and wetness, dust odors, fumes and pulmonary irritants, extreme cold, extreme heat, vibrations and moderate noise, and could never be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle. (Doc. 14, pgs. 528-532).

On September 13, 2013, Dr. Diamond noted that Plaintiff had an EEG, which was normal, was weaned off of tetrabenzine, and was doing well until the past few weeks , but had more loss of balance and had fallen. (Doc. 14, p. 521). At that time, Dr. Diamond

reported: "Given the patient's movement problems I do not see how she can hold employment." (Doc. 14, p. 523).

On October 1, 2013, Plaintiff was examined by Dr. Richard M. Dubinsky, at The University of Kansas Hospital. (Doc. 14, p. 539). He reported that Plaintiff continued to have "spells of moving her head to the left, shoulder shrugging, blowing and lip sucking." (Doc. 14, p. 539). It was also reported that Plaintiff had periods of turning head to the left, shrugging her shoulder, lip puckering and pulling of her left side of the mouth that were not distractible. (Doc. 14, p. 540). Dr. Dubinsky discussed possible treatment options, including the potential use of deep brain stimulation. (Tr. 541). Plaintiff thereafter went through physical therapy at Spine and Sports Soft Tissue and Joint Care, between October 2, 2013, and November 12, 2013. (Doc. 14, p. 548-560).

On November 3, 2013, a MRI of Plaintiff's Cervical Spine Without Contrast revealed:

1. Congenital central canal stenosis exacerbated at multiple levels by disc osteophyte complexes, most severe at C5-6

2. Multilevel predominantly left sided foraminal narrowing from C3-4 through C5-6

3. Straightening with reversed lordosis centered at C5-6.

(Doc. 14, p. 545). On November 19, 2013, Plaintiff saw Dr. John Towbin, of The Epilepsy Center. (Doc. 14, p. 564). He noted that Plaintiff's head turned to the right, she was on Keppra, which was increased after her most recent episode, and that she complained of sedation. (Doc. 14, p. 564). He further reported that as the MRI of her cervical spine was abnormal, she was starting physical therapy. (Doc. 14, p. 564). Plaintiff advised Dr. Towbin that ten years previously, she was diagnosed with obstructive sleep apnea and prescribed a

CPAP, but found it to be intolerable. (Doc. 14, p. 564). At that time, Plaintiff appeared sleepy, there was upward drift in the Plaintiff's left upper extremity, and coordination testing showed clumsiness in the left upper extremity with rapid alternating movements and normal finger-to-nose testing bilaterally. (Doc. 14, p. 565). Plaintiff had lip smacking and turned her head to the left, related to her tardive dyskinesia. (Doc. 14, p. 565). Dr. Towbin concluded that a cardiac component was suggested, and he discussed the importance of treating sleep apnea and the risks of untreated sleep apnea, including the risk of developing cardiac dysrhythmia. (Doc., p. 566). He also discussed the possibility of convulsive syncope vs. seizures vs. a combination of those etiologies. (Doc. 14, p. 566). Thereafter, on January 13, 2014, Plaintiff underwent a total of four days of continuous video EEG monitoring, and on the third day of monitoring, occasional, mild, asymmetrical slowing was seen in the left hemisphere at times that was not seen on the right. (Doc. 14, p. 573). Plaintiff also underwent a tilt table test and became symptomatic during the study. (Doc. 14, p. 573). Dr. Van H. De Bruyn, a cardiology consultant, saw Plaintiff on January 13, 2014, and diagnosed Plaintiff with seizures vs. convulsive syncope; near syncope; "Poss AFI/AF" Poss OSA," "PCN and Sulfa all," obesity, and tardive dyskinesia secondary to reglan. (Doc. 14, pgs. 590-591). On January 17, 2014, the discharge summary reported that there was no evidence that Plaintiff had a propensity for seizures, but that it was more likely that her episodes of loss of consciousness were syncopal. (Doc. 14, p. 575). Her primary discharge diagnosis was "Episodes of unclear etiology." (Doc. 14, p. 575). A polysomnogram report dated February 10, 2014, revealed Plaintiff suffered from mild to moderate obstructive sleep apnea. (Doc. 14, p. 807).

In his decision dated March 20, 2014, the ALJ discussed all of the various medical records, and concluded that the opinions of the state agency medical consultants had been considered, and were given "great weight." (Doc. 14, p. 25).   The ALJ noted that Dr. Diamond's records indicated that Plaintiff was unable to work, but stated that "a review of all his records, together with the other objective medical evidence of record, does not support that severity of symptoms." (Doc. 14, p. 25). He found Dr. Towbin's testing did not result in a definitive diagnosis of seizures, and seizure medication was not re-started, and that the Plaintiff's report of neck pain and cervical stiffness were supported by the MRI study, but that "the inability to work without some pain or discomfort is not a sufficient reason to find a claimant disabled with the strict definition of the Act." (Doc. 14, p. 25).

The Court notes that throughout the record, although Plaintiff's involuntary movements had improved somewhat, they never completely disappeared. At the hearing, Plaintiff testified that at her job as a credit card clerk, she sat at the computer for eight hours, but that at the time of the hearing, she could not sit and look at the computer screen very long because her head turned to the left a lot. (Doc. 14, p. 40). She also testified that she was unable to drive because she could not keep her head straight. (Doc. 14, p. 40). She stated that she did not take pain medication, but that she took medicine to try to help control the tardive dyskinesia. (Doc. 14, p. 41). Noticeably absent from the ALJ's discussion was the more recent seizure-like episode Plaintiff had in August of 2013. (Doc. 14, p. 526). Plaintiff testified that her head jerking was constant and only stopped when she slept. (Doc. 14, p. 44). She stated that she did not scream out like someone with Tourette's syndrome, that sometimes she would make noises, or would suck on her lips or something, but had the same movements that those with Tourettes had. (Doc. 14, p. 45).She testified that she was on

10

medication to stop her seizures, and was not having any current problems with the seizures. (Doc. 14, p. 47). She also testified that she was having trouble with choking and with her speech slurring off and on all day. (Doc. 14, p. 52). The Court also notes that in the Field Office Report dated July 11, 2012, it was reported that Plaintiff's head "shook constantly during the interview in a 'nodding' motion." (Doc. 14, p. 197).  This was confirmed by testimony of Plaintiff's husband and mother. (Doc. 14, pgs. 56, 58). The Court also notes that Plaintiff complained of sleepiness to Dr. Towbin, after her Keppra dosage had been increased, and Dr. Towbin noted Plaintiff appeared sleepy. (Doc. 14, p. 565).

The Court does not believe the ALJ gave sufficient reasons for not giving the opinion of Plaintiff's treating physician, Dr. Diamond, greater weight. In addition, the Court believes the medical evidence in this case reveals that Plaintiff suffers from additional impairments, such as obstructive sleep apnea and canal stenosis, which should be considered by an examining physician, and the side effects of her medication should also be considered when the physician completes a new Physical RFC Assessment. Also, the additional medical records considered by the Appeals Council relate to a potential cardiac problem, and the Court cannot say that had the ALJ considered them, the result would have been the same. Since Plaintiff's medical records during the relevant time period reveal a potential cardiac problem, and since the additional medical records considered by the Appeals Council are dated only a couple of months after the ALJ's decision, and relate to a potential cardiac problem, the ALJ should consider those records as well.

**IV.**     **Conclusion:**

11

Accordingly, the Court concludes that the ALJ's decision is not supported by substantial evidence, and therefore, reverses and remands this matter to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. §405(g).

IT IS SO ORDERED this 3rd day of August, 2016.


/s/ *Erin L. Steer*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE